Number 171223, PREP Tours Inc. v. American Youth Soccer Org. et al. Good morning, Your Honor. Your Honors. Stephen Torres, Counsel for the Plaintiff, Appellant of PREP Tours Inc. May it please the Court. May it proceed. The appeal today involves an order by the District Court dismissing PREP Tours' claims for lack of personal jurisdiction. And specifically on the second prong of the jurisdictional analysis, the Court dismissed by finding that there was a lack of purposeful availment. PREP Tours believes that when you apply the applicable standard to the record before the Court, that was reversible error and that the case should be remanded so that it could proceed in the District Court. Before getting to the issues that the parties disagree upon, there are a fair number of things that there is an agreement upon. One is that both sides agree that the standard of review here is de novo, so that there is no deference afforded to the District Court's determination. The parties also agree that the applicable analysis here is the due process minimum contacts analysis for determining jurisdiction. And then number three, the parties also agree on what the test is to apply, whether or not there is relatedness, whether or not there is purposeful availment, and whether or not it would be reasonable to proceed with the case in the District Court. And then finally, before the case agreement ends, we submit that the factual record that was presented here most importantly shows that there was contact initiated by the defendants, ASO, Downey 24, the soccer group in California, that they initiated the relationship, which we believe for collaborative and iterative communications and interactions between both ASO and PrEP TORS. And here, the contacts were specific to, and the actions were specific to Puerto Rico. Can I just understand the scope of the argument? Suppose that you're located in California? No, my client is here in Puerto Rico, PrEP TORS is in Puerto Rico. I'm sorry, the... Yeah, the folks are in California, Your Honor, yes. So if a person in California calls a Florida travel agency to book a weekend in Puerto Rico... Yes. Is your contention that there are now sufficient minimum contacts in Puerto Rico? So that would be a factually distinct... But I'm trying to figure out whether your position is that although it's factually different, there would be minimum contacts in that case. No, in that case, I don't know that there would be, Your Honor. So what's different between that case and this case? So this case we submitted for purposeful availment falls within the three factors that this court has found both in Downer... No, what's the difference between the case I said and that case? Oh, the difference in the case is here, they retained a service provider in Puerto Rico, and they anticipated... Okay, so what I just find puzzling about that is we know that the fact that you contact somebody in a jurisdiction does not itself satisfy purposeful availment, it's what you're asking that person to do in the jurisdiction, right? Well, if I contact a Florida travel agency to do the same things that I request a Puerto Rican travel agency to do, what is the difference between the two cases? Because what they knew what we would have to do would all be done in Puerto Rico. In order to organize the trips... It's true if I called them in Florida. There's no way that the Florida agency can book me a tour in Puerto Rico without calling people in Puerto Rico. Right, and in this case, they knew that we would do a series of events in Puerto Rico. When I'm worried, the theory seems to be any travel agent I contact anywhere in the world that looks into a trip that I want to take anywhere in the world has now got minimum contacts with my destination. I don't think that this runs afoul of what this Court has found both in Downer and then subsequently in the COSART and in the Compia Communications. It said three factors. You have to find that the defendant has to solicit the plaintiff in the forum. In your example, you haven't contacted the plaintiff in the forum because in your example, you've called Florida. In our case here, you haven't run afoul of those three factors. But in a case like this, why does it matter? I mean, I'm calling a travel agency to book me a trip in a destination. This was far more involved than just calling a travel agent and booking a flight. They knew because the second prong is you have to anticipate that there will be substantial activities in the forum, which again in that instance in Florida, all you're doing is making a few phone calls here. But then if that's the key thing, it's the intensity of what the travel agent was being asked to do in terms of planning. The intensity is absolutely a relevant factor. It's relevant. It is absolutely relevant because you have to anticipate that they're going to take substantial actions within the forum, which in that case, if you're in Florida, again, you're not in the subject forum. Here, this is much more involved than just booking a trip. That would be true if I called the Florida agency also, right? If you called the Florida agency, you haven't reached into the subject forum. And in that instance, it's much more akin to ordering a product. And it doesn't matter where the product is made. I asked the Florida agency to plan the same trip that I asked the Puerto Rico travel agency to plan. What is the difference between those two cases? Well, the first instance is you haven't reached into the subject forum.  What would be the significance of that? Well, I think in the COSART, Downer, and the Compia courts all found that that's an important – I know, but how do you explain why in the context of a travel agent? Obviously, what I'm interested in is getting to the destination. Well, here, I have to say for this type of trip, a cultural education, a cultural immersion trip, it's very important that I say that this involves not just the lodging, which it did, and calling hotels, which they did here in Puerto Rico, meals for 150 at least people, transportation, again, here. But it also involves setting up the soccer. So you had to contact and know people in Puerto Rico so you could get the fields and so that you could get the soccer matches organized. Do you imagine they had done it? They had booked the field? I can represent that my – Does the complaint allege that they – Oh, it doesn't say that they booked the fields. It said that they started the arrangements to – and they provided the itinerary. It absolutely says that the soccer coordinator for prep tours was in communication with the ASO personnel. That's absolutely in the record. So they undertook all of those things in Puerto Rico. Now, it's conceivable, Your Honor, that a travel agent in Florida would have those contacts, but I don't know that it's as likely. Instead, it took the local knowledge of prep tours and now it goes back to, well, now it's not random or fortuitous to be sued in Puerto Rico when you've taken all of these steps. You've contacted a travel agent in Puerto Rico because of their local knowledge to book the cultural immersion excursions. Again, that would be much more difficult to do with someone in Florida, so it makes it much less likely. Here, if you contact someone in Puerto Rico and you undertake all of these steps, you get all of this work product from them, you communicate with them, and you say, okay, the only thing left is we're going to wire the deposit the next day, and then you decide that you're not going to go forward. We found in instances that that's not random, it's not fortuitous, and it doesn't offend our notions of justice and fair play. Here, everything – all of the activity happened in Puerto Rico. They contacted a service provider in Puerto Rico. So when they decided to not proceed forward, they should not have been surprised that they were called into court in Puerto Rico to defend themselves. So it's certainly, we would say, reasonable. Were you given by the travel agency a list of the actual hotels? We provided them the information. We gave them all the information about the hotels. We gave them a series of itineraries, and this wasn't just they called us, we sent them some information, and that was the end of it. It was a collaborative effort. The record shows we sent them the itinerary. They said, oh, this is great, but we would like a specific number of matches. We want to travel on certain days. We get them information again. They said, we want the price to be below $2,000. We got them that information, too. And they contemplated a series of – What the information was. You sent them back, the record shows. Yes. The actual hotel. The actual itinerary. The hotel, day by day, almost hour by hour, action of what they were going to do. It contemplated we would be with them 24 hours a day. It had the dates. It had the flights. The hotels were blocked. There was some communication about the urgency that you need to book it because we're holding blocks of hotel rooms. They sent a list of all the players. By the time they sent the final roster, it was 252 people were going to travel. So it was a large undertaking. So we say in today's commerce, this case is consistent with the way that this court has found that modern business is conducted. No further questions. I'm out of time. Yes. Counselor, it's your position that Ms. Ramirez, who was, as I understand it, simply a volunteer for one of these organizations, that personal jurisdiction analysis, focusing on purposeful environment that you're advocating, that she is every bit as subject to personal jurisdiction in the way that the American Soccer is and Region 24, those entities. There's something that seems a bit unfair, but I don't sense that you differentiate between your exposure to personal jurisdiction. Is that correct? Yes. There were individual defendants named as well as the corporate entities. It was alleged in the complaint that they had undertaken the activity. Ms. Ramirez, in particular, was the one who was the most in communication with prep tours, and that her conduct and the conduct of her other colleagues is imputed to the corporate entity for jurisdictional purposes and that they would be subject to personal jurisdiction as a result. Okay. You emphasized the fact that these entities, they eventually did come to Puerto Rico, working, I gather, with a California organization. I can understand how that would, as an evidential matter, strengthen your pre-contract good faith claim, but what is the jurisdictional relevance of the fact that they eventually came to Puerto Rico? Does that have anything to do with purposeful abandonment? Yes. It certainly, Your Honor, it certainly goes to the heart of relatedness, which the district court found was a- But not purposeful abandonment. Is that correct? For purposeful abandonment, it certainly shows, I would say, that it's not so random and fortuitous to be hailed into court to Puerto Rico, that this wasn't something that they were merely exploring that they may do, but in fact it's consistent with our view that the group was absolutely going to go to Puerto Rico and that when they did ultimately do it, they shouldn't have been surprised that the agency and the company that they had jilted in favor of the local California entity was going to sue them. So I'd say, again, it does, I would say it is relevant to purposeful abandonment, although it's more directly on point with relatedness. Were they able to use any of the information you provided? Your Honor, because the case was dismissed pre-discovery, we certainly believe so and have a good faith basis for saying so, but that hasn't been developed yet as to the extent at which they took our information and proceeded with it, but we certainly believe that they did use much of what had been prepped to his work product. Thank you. Thank you. Mr. Dagan, good morning. Good morning, Your Honor. May it please the Court, my name is Alan Dagan, and I not only represent the defendants, but pardon the jurisdictional pun, I relate with these defendants because I'm also an AYSO volunteer in my other life in South Florida. And what these defendants did, unlike in Downing, unlike in COSART, this is a one and done bidding procedure for the purchase of services. This is not a four-year employment agreement like Downing, where the out-of-state company hired Downing in the foreign state, worked with him, paid him, dealt with him for four years on a continuous and systematic basis, and then say, whoa, we don't have jurisdiction in the foreign state. This isn't like COSART, two employment agreements, not one, two. And the second employment agreement was 14 months into the agreement, and only when COSART actually succeeded in that case in doing what he was employed to do, but the company, the out-of-state company, which had set up a local sales office, no less, in the foreign state, the out-of-state company just didn't want to pay him his commission, basically said, look, unless you cut your commission, we're not even going to fulfill the contract that you made. Those are cases where it's foreseeable to be hailed into court in that jurisdiction. Here you have a bunch of volunteers who have done nothing other than seek bids for a one-time trip. This is not a continuous relationship. This was never going to be a continuous relationship. There's no evidence to suggest it ever would have been anything beyond what it was. We have a bunch of kids who are going to spend some money on a soccer trip. They feel like going to Puerto Rico this time. Can you, with full knowledge that we're seeking three bids, which is our fiduciary obligation. Can I just, just to get a, there's so many different factors that could be irrelevant. So suppose FIFA calls up, prep tours. It's your lucky day. We'd like you to help us plan the World Cup. That's one and done. That would be their lucky day. That's one and done. So you'd say no minimum context? You didn't purposely avail yourself of Puerto Rico in that circumstance? Well, we'd need to know more facts. Jurisdictional facts relate to it. So they then ask them to, you know, do the kind of work that would be necessary to put together a bid for the World Cup, which you would probably assume would be a lot of work. If it's just the bidding process in and of itself, and then there's no contract formed, I would say that's not purposeful availment. Because all they're doing is soliciting bids from, in this case, probably all around the world, which is probably what FIFA does. I can't speak to that, but I'm sure that's what they do. So I guess what I don't fully grasp is why, if you know that you've just made a bid that's going to require lots of work in the jurisdiction by the person you're asking, why is it unreasonable to think it's not just a, you know, mere purchase and sale type thing. I'm asking you to do a bunch of work in the jurisdiction to put together the bid for me. Now, if it turns out there's no legal claim that one can bring, then obviously you're not at much risk of being sued there. But if there is a legal claim for how you did the bid work, the question of whether you should know that there's minimum contact at that point seems like you would want to look at, well, how much, as my agent, were I asking you to do in that jurisdiction. If I was asking you to do a lot, then that should be enough to put me on notice that I might be sued by the agent for all the work that I was doing. I get the gist. I think there's a distinction between whether there's any record evidence whatsoever that any of these defendants knew that there would be such this enormous amount of work that PREPTORS is claiming. I mean, you know, they utilized a Florida agency to book the airfare. They clearly have prepackaged flyers that they sent. They clearly have prepackaged brochures and itineraries because, as they claimed, they're the experts. So they've done this hundreds, maybe thousands of times. When I look at it, I don't see this as, you know, they have a pizza party planned. We all know kids love pizza. How much work and expertise is involved in planning a pizza party? You show up and you eat the pizza. And was there anything, is there anything in the record to suggest how much work was being asked to be done of the tour company with respect to the planning of the soccer game? I don't recall anything specific relative to that other than the request included soccer games. There's no record evidence that they booked a field or that anything was done relative to that, frankly. And relative to one of the questions earlier, I think constitutional due process requires that you look at jurisdiction for each defendant. And what did each defendant do? I think we can all agree that AYSO as a national organization did literally nothing. Region 24 did literally nothing, not to mention it doesn't exist. It's not a legal entity. So you have four volunteers, volunteer dads or moms. Two of them did literally nothing until the last day of the chronology, February 25th, where they very professionally and politely in response to prep tours emails of, hey, we still haven't heard what's going on, they said we decided on one of the other bidders. If that is a contact that is jurisdictionally sufficient, I would submit the number one problem we have is getting volunteers. This would have a tremendous chilling effect on getting any more volunteers ever. It's simply telling an unsuccessful vendor that we chose someone else is enough to make us have to fly around the country or outside the country to defend ourselves from a claim like this. No one's ever going to volunteer for anything. Mr. Jackson did literally nothing in this jurisdiction. He sent the one email to the Florida Travel Agency, which apparently was the one booking the airplanes. That leaves just the one defendant of Ms. Ramirez. And what did she do? She said send us information. Thanks. We'll let you know when we decide. Can you tweak it a little bit because we're looking at three bids. Bullet points for specifics, quote, before we can decide. Thanks. I will forward it to the others. And then we're going to have to go through the we, meaning us, our board, our volunteers need to go through this with a fine-tooth comb. Those are all the contacts that occurred here. I humbly suggest that it's crystal clear that it would be more than mildly unreasonable to expect these volunteers, that they have somehow injected themselves into this jurisdiction for purposes of having to defend the lawsuit here. Thank you, Your Honor. Just to be clear, so if the executive director of the organization sent the same emails, you think it's a different case? I'm trying to isolate what the point is. Is the point that the contacts are too minimal or is the point that they are sufficient but it would be unreasonable because of the nature of the person who made the contact? No, I think it's that they're too minimal. So it doesn't matter that it's a volunteer. If the head of the soccer organization did the exact same thing, you'd also say no minimum contacts. Well, the head of the soccer organization is also a volunteer, just so that we're all clear. It's not in the record, but every individual defendant, and this is in the record, is a volunteer. But if it was a paid executive director who made the contacts, you'd be making the same argument, right? I would be making the same argument. I think there's a distinction, however, for jurisdictional purposes and fairness principles, between a volunteer who's simply trying to organize a trip for their kid. And where's that? That comes in at the third prong? That would be part of the Gestalt factors of reasonableness, burdensome to the defendants and things like that. But the purposeful availment is also just these contacts were below minimum. Thank you, Your Honor. Excuse me. The conversations you referred to took place on an e-mail on December 23rd, in which Ramirez also informed that they were going to Puerto Rico for sure. Now, there were other e-mails according to my information. Maybe I'm wrong. There was an exchange of itinerary on December 31st. On January 18th, Ramirez provided prep tours with a breakdown of the team going to Puerto Rico. There was also an e-mail later on, which, well, that's it. Did they make any difference? Not at all, Your Honor. I think I summarized the Ramirez e-mails. And I didn't recite every single one of them this morning, obviously, and it's all in the record. But these e-mails collectively are basically, look, we're letting you know there's three bidders here. Because that's our fiduciary responsibility, by the way. We're dealing with kids' money. So we have to bid this out. That's the responsible thing to do. We want to make sure we provide the best experience for the kids. So you tell us, you're the experts, right? You tell us what your proposals are, what your proposed itinerary is. We look at it, tweak this, tweak can you get the price a little lower perhaps. We have certain situations develop. And then, of course, we say before we can decide, we need this information. And then the other parties who did nothing up to now, no communications, no context whatsoever, those are the February 25th e-mails that say we chose another vendor. Thank you. Judge Leibniz, do you have any questions? Yes, thank you. I'm looking at the appellant's brief. They are describing the allegations in the complaint, and they're saying that pursuant to those allegations, your clients made requests of them, the plaintiffs, that required PREP tours to undertake dozens of contacts in Puerto Rico on the AYSO defendant's behalf. In response to the request from the clients, PREP researched and arranged properly suited hotels, airline options, organized soccer matches, planned appropriate educational excursions and negotiated prices. The clients say that they had to require a large number of Puerto Rico-based hotels, restaurants, soccer teams, et cetera. Those are the allegations. In the face of those allegations, the district court, what I would suggest, is really a fundamental analytical error in evaluating a purposeful agreement. It describes all of those actions that PREP tours said they had to undertake as unilateral actions on their behalf. Those are not unilateral actions that PREP tours undertook, but they were actions that they took in response to the request from your clients. So isn't your argument both inconsistent with the allegations in the complaint with respect to what PREP tours was asked to do by your clients and all those things that they undertook? Those weren't unilateral actions, were they? Well, some of them may certainly have been unilateral actions because they never reached the point where a contract was formed. They never reached the point where their bid was approved. This was an informational exercise of attempting to get information for a trip that we might use with PREP tours or someone else. And then we're going to compare the bidding package of the three travel agencies or other entities that provided it. But, Counsel, aren't you indicating that's probably another analytical error in the district court's decision because they have an alternative claim. It's not just a contract failure. It's a pre-contract, bad-faith negotiation claim, which is a very liable, which is a well-recognized claim in Puerto Rico. Yes, Your Honor. However, in the complaint, the only thing they allege that speaks to that is their claim that they were not, they, meaning PREP tours, was not told why the decision was made not to use them. The claim for pre-contract unfair negotiations is premised on some kind of fraud or fraud-like wrongful conduct. There's no facts that's developed, that's alleged, rather, that suggest that is true, remotely true. But, moreover, given the opportunity to present declarations on the jurisdictional issue, because it's the plaintiff's burden to prove jurisdictional issues against each and every defendant, if any of this was accurate, they certainly had every opportunity to put that in one of the declarations. They did not. They simply said we don't, we weren't told why we weren't the successful bidder. That's a great leap of faith to now say jurisdictionally that, therefore, there must have been some kind of fraud. They don't even allege fraud. They simply say that we weren't told why. I don't understand the relationship between that and the jurisdictional point you're making. It seems like that's the merits of the claim. Well, it is, it does speak to the merits of the claim, but the jurisdiction The question is just where you have to hear the claim. Absolutely, Your Honor. But the issue of if it's not alleged, I understood the question to speak to the allegations of the complaint. The allegations were about the contacts. Correct. So were those not alleged? No, the contacts were alleged eventually. In other words, when we got it. So all those contacts occurred that Judge Lopez just read from the brief. I don't fully understand what your point is. You have to just make it, those were not unilateral contacts. They were only undertaken at the request of the requesting party as the agent of them. When they said we'd like the bid, it's not like they woke up one morning and said maybe there's a person in California who would like to know about this. They got a phone call. Could you prepare a bid for us? Correct. For our trip. In response to that request, they then did all of these things. Well, that's correct. And we discussed it before, the quality and the quantity of those things may be in dispute. But Judge Lopez is reading you that list of activities. Yes. That were said to have been done in response to the request for an itinerary. Is that listing incorrect? Or is that list, do you dispute the listing that he just read from their brief? Well, no. Whatever is in the record that was actually alleged and or presented by that. They listed dozens of contacts had to be made in Puerto Rico to prepare the itinerary, including contacting multiple hotels, arranging the soccer games, et cetera. Does the record support that in your opinion? The record I do not think supports that. But, moreover, the unilateral nature of it is the extent that they may have been by virtue of being, let's just say, an overeager seller or bidder. They clearly wanted the contract, and perhaps they did significantly more than they were asked to do in order to maybe succeed in getting the contract. But there's no evidence, for example, that they set up one soccer field. There's no evidence that they set up one soccer game. There's no evidence that they attempted to do any of those things. There's no evidence of these multiple hotel accommodations. Again, this is a company that they themselves claim are the experts, that they've done this hundreds or thousands of times. They put together initially a clearly prepackaged flyer and itinerary of trips that they've done, as they themselves claim, hundreds or thousands of times before. Thank you, Your Honor. Thank you.